**ICC INDUSTRIES, INC.; ICD Group, Inc., Plaintiffs,**

v.

**UNITED STATES, et al., Defendants.**

**Court No. 84–2–00252.**

United States Court of International Trade.

March 19, 1986.

Brownstein Zeidman and Schomer (Steven P. Kersner and Donald S. Stein, Washington, D.C., of counsel), for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Dir., Commercial Litigation Branch (J. Kevin Horgan, attorney Commercial Litigation Branch), Berniece A. Browne, Sr. Trial Counsel, Office of the Asst. Gen. Counsel for Import Administration, Dept. of Commerce, Carol McCue Verratti, attorney, Office of the Gen. Counsel,

U.S. International Trade Com'n, Washington, D.C., for defendants.

## OPINION

WATSON, Judge.

This action challenges agency determinations[1] which gave a retroactive effect to the imposition of antidumping duties on importations of potassium permanganate from the Peoples Republic of China (PRC). To achieve retroactive effect the Commerce Department had to make a final determination that "critical circumstances" existed under the terms of 19 U.S.C. § 1673d(a)(3)[2] and then the International Trade Commission had to make additional findings under 19 U.S.C. § 1673d(b)(4)(A)[3] that retroactive duties were needed to prevent a recurrence of material injury. Both of these determi-

nations are challenged as being unsupported by substantial evidence and otherwise not in accordance with the law.

Normally, a determination that importations are being sold at less than fair value will begin to have an effect only as to those entries of merchandise entered after the date of publication of the notice of the preliminary determination by the Commerce Department. Liquidation of those entries will be suspended and the posting of security for the payment of estimated duty will be ordered in the manner set out in 19 U.S.C. § 1673b(d).[4] However, in conditions known as "critical circumstances", under the terms of 19 U.S.C. § 1673b(e)(2)[5] the suspension of liquidation and the ultimate obligation to pay antidumping duty can apply to entries of merchandise made

---

**1.** The final determination of the Department of Commerce was published in 48 Fed.Reg. 57347.

The final determination of the International Trade Commission was published in 49 Fed. Reg. 3148 and USITC Publication 1480 (January 1984).

**2.** 19 U.S.C. § 1673d(a)

\*　　\*　　\*　　\*　　\*　　\*

**(3) Critical circumstances determinations.—** If the final determination of the administering authority is affirmative, then that determination, in any investigation in which the presence of critical circumstances has been alleged under section 1673b(e) of this title, shall also contain a finding of whether—

(A)(i) there is a history of dumping in the United States or elsewhere of the class or kind of merchandise which is the subject of the investigation, or

(ii) the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the merchandise which is the subject of the investigation at less than its fair value, and

(B) there have been massive imports of the merchandise which is the subject of the investigation over a relatively short period.

**3.** 19 U.S.C. § 1673d(b)

\*　　\*　　\*　　\*　　\*　　\*

**(4) Certain additional findings.—**

(A) If the finding of the administering authority under subsection (a)(2) of this section is affirmative, then the final determination of the Commission shall include a finding as to whether the material injury is by reason of massive imports described in subsection (a)(3) of this section to an extent that, in order to prevent

such material injury from recurring, it is necessary to impose the duty imposed by section 1673 of this title retroactively on those imports.

\*　　\*　　\*　　\*　　\*　　\*

**4.** 19 U.S.C. § 1673b

\*　　\*　　\*　　\*　　\*　　\*

**(d) Effect of determination by the administering authority.—**If the preliminary determination of the administering authority under subsection (b) of this section is affirmative, the administering authority—

(1) shall order the suspension of liquidation of all entries of merchandise subject to the determination which are entered, or withdrawn from warehouse, for consumption on or after the date of publication of the notice of the determination in the Federal Register,

(2) shall order the posting of a cash deposit, bond, or other security, as it deems appropriate, for each entry for the merchandise concerned equal to the estimated average amount by which the foreign market value exceeds the United States price.

\*　　\*　　\*　　\*　　\*　　\*

**5.** 19 U.S.C. § 1673b(e)

\*　　\*　　\*　　\*　　\*　　\*

**(2) Suspension of liquidation.—**If the determination of the administering authority under paragraph (1) is affirmative, then any suspension of liquidation ordered under subsection (d)(1) of this section shall apply, or, if notice of such suspension of liquidation is already published, be amended to apply, to unliquidated entries of merchandise entered, or withdrawn from warehouse, for consumption on or after the date which is 90 days before the date on which suspension of liquidation was first ordered.

during the ninety-day period *prior* to the normal date of suspension of liquidation.

The law provides that if the Commerce Department finds that massive importations have occurred and there is either a history of dumping or actual or constructive knowledge by the importers that the merchandise under investigation is being dumped, then the ultimate determination can affect unliquidated entries made in the expanded, pre-suspension ninety-day period.

The "critical circumstances" which justify the expanded effect of the investigative determination can be determined by the Commerce Department as a preliminary matter under 19 U.S.C. § 1673b(e), or, even if the preliminary determination on that question is negative, can be found as part of the final determination under 19 U.S.C. § 1673d(a)(3).

As a preliminary matter, "critical circumstances" may be found on the basis of belief or suspicion by the Commerce Department that the statutory conditions are present. As a final matter, however, given the standard of judicial review to which it is subjected under 19 U.S.C. §§ 1516a(a)(2)(B)(i) and 1516a(b)(1)(B), the determination must be supported by substantial evidence.

■ In this case, because there was no history of dumping of potassium permanganate from the Peoples Republic of China, the final determination depends first, on the existence of massive imports, a fact which is amply supported by substantial evidence, and, second, on a finding that the importers knew or should have known that the merchandise was selling at less than fair value. The latter finding is disputed by plaintiffs.

The determination by the Department of Commerce that importers knew or should have known that the potassium permanganate was being sold at less than fair value was expressed, at 48 Fed.Reg. 57349–50, as follows:

> ... After considering all of the circumstances in this industry, we conclude that U.S. importers knew or should have known that potassium permanganate from the PRC was being sold in the United States at less than its fair value. The following factors have led us to that conclusion:
>
> First, since U.S. importers admitted that the potassium permanganate bought at "competitive prices" in the European market and subsequently imported into the United States was PRC material, they were clearly aware of the price at which potassium permanganate from the PRC, both directly from the PRC and indirectly through Europe, was being sold for in the U.S. and European markets.
>
> Second, since importers were also aware of pricing of potassium permanganate in the U.S. market place from the two other alternative sources (Carus [the United States producer] and Spain), they were aware of the entire range of pricing in a market place where pricing is a major factor in determining sales.
>
> Third, since Spain is not a state-controlled economy country and the only other principal producer of the product that exports to the United States, importers knew or should have known, at least generally, what the value of the product is in market economy countries, and thus the minimum likely fair value of the PRC merchandise.
>
> Fourth, during the period of March through July, 1983, (from Initiation of this investigation to Preliminary Determination), the unit price of potassium permanganate imported into the U.S. from the PRC was 22% less than permanganate imported from Spain (all other sources). Importers should have known how to anticipate our antidumping methodology for Spain. They clearly knew that potassium permanganate from the PRC was being sold well below the Spanish price.
>
> Fifth, knowing that potassium permanganate from the PRC was priced significantly below that sold by the only other non-U.S. market economy producer (i.e., the most likely source of our fair value standard), importers knew or should

have known that the PRC exports were at less than fair value.

Based on the preceding analysis, we determine that the unique circumstances found in this industry are such that we can impute knowledge of sales at less-than fair value to the importers even though they could not anticipate the exact basis for our fair value determination.

When the conclusions of the Commerce Department are reduced to essentials, the five supporting factors are really one—that the importers knew that the price at which they were importing was 22% below the price of importations from Spain. This is the most concrete and "damaging" piece of knowledge attributed to the importers—the price was 22% below the lowest price at which the merchandise was being sold to the United States.

The question then becomes whether this sort of knowledge, i.e., of price differential alone, is sufficient to establish or impute knowledge on the part of the importer that the product is being sold at less than fair value. The Commerce Department is concerned that if it cannot make inferences and attribute knowledge of dumping based on knowledge of price differentials, massive injurious imports from state-controlled economies can enter with impunity during the first dumping investigation of a product from those countries.

This would come about because a foreign market value in a country with a state-controlled economy may not be immediately ascertainable under 19 U.S.C. § 1677b(a). This is a circumstance which is recognized in 19 U.S.C. § 1677b(c) [6] in which special indirect methods have been provided for determining the foreign market value of merchandise in state-controlled economies.

Although the issue is not without its difficulties, the court is of the opinion that in a close-knit international market for a fungible commodity, a price differential between the price from a state-controlled economy and the price from a market economy, of the magnitude involved here, is sufficient to alert importers to the fact that the product from the state-controlled economy is being sold at less than fair value. Accordingly, it may fairly be said that, even considering that there is no immediately ascertainable market value in the home market of a state-controlled economy and even absent any knowledge of how fair market value would ultimately be calculated for the country of production, the importers should have known that the price was "too good to be true" and too low to emerge unscathed from administrative scrutiny.

It must be admitted that this situation represents a minimal factual predicate for imputing knowledge to an importer and a considerable allowance of discretion to the agency. But in view of the possibility that otherwise the law could not cope with the first occurrence of massive, dumped imports from a state-controlled economy, it appears to be an unavoidable exercise of agency expertise in an emergency situation. When done with attention to the structure of the international market, the nature of the commodity and the magnitude of the price differential, it is a permissible determination and those factors con-

---

**6.** 19 U.S.C. § 1677b

   \*     \*     \*     \*     \*     \*

**(c) State-controlled economies.**—If available information indicates to the administering authority that the economy of the country from which the merchandise is exported is State-controlled to an extent that sales or offers of sales of such or similar merchandise in that country or to countries other than the United States do not permit a determination of foreign market value under subsection (a) of this section, the administering authority shall determine the foreign market value of the merchandise on the basis of the normal costs, expenses, and profits as reflected by either—

(1) the prices, determined in accordance with subsection (a) of this section, at which such or similar merchandise of a non-State-controlled-economy country or countries is sold either—

(A) for consumption in the home market of that country or countries, or

(B) to other countries, including the United States; or

(2) the constructed value of such or similar merchandise in a non-State-controlled-economy country or countries as determined under subsection (e) of this section.

stitute substantial evidence in these circumstances.

In sum, the determination of the Commerce Department is within the range of discretion it has been accorded, *Consumer Products Div., SCM Corp. v. United States*, 753 F.2d 1033 (Fed.Cir.1985), and is supported by the degree of evidence which has been found sufficient in such matters. *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed.Cir.1984).

Plaintiffs have also challenged the final determination of the International Trade Commission (ITC) on the subject of critical circumstances for failing to separately find a causal link between the massive imports and the material injury.

The statutory language governing the ITC determination reads as follows:

19 U.S.C. § 1673d

(b) . . . . .

(4) Certain additional findings.

(A) If the finding of the administering authority under subsection (a)(2) of this section is affirmative, then the final determination of the Commission shall include a finding as to whether the material injury is by reason of massive imports described in subsection (a)(3) of this section to an extent that, in order to prevent such material injury from recurring, it is necessary to impose the duty imposed by section 1673 of this title retroactively on those imports.

■ In the opinion of the court, where a finding has been made that imports priced at less than fair value are being knowingly entered in massive quantities during an investigation, the ITC is not required by law or considerations of fairness to isolate the massive quantities and make them the separate subject of an injury determination.

In those circumstances it is sufficient if the ITC concentrates on the capacity of these massive imports to render ineffectual the normal imposition of duties (prospectively from the date of publication of the preliminary determination) and thereby bring about a recurrence of the material injury primarily caused by normal levels of importation.

It must be admitted that the language of 19 U.S.C. § 1673d(b)(4)(A) can be read as requiring that material injury be attributed to the massive imports by themselves, rather than to the entire corpus of normal and massive imports, as was done here. But that reading, although it is possible, does not harmonize with the special purpose of a provision for critical circumstances. In this instance, the clear emergency purpose of the provision justifies a greater than normal flexibility in its interpretation and in the analysis and treatment of massive imports entered during an investigation.

With some effort, it is possible to read this provision as speaking to the material injury caused by both normal and massive imports, with the participation of the massive imports being more as an instrument of recurrence than as an original or separate cause. It is even possible to read this provision as presuming the participation of the massive imports in the material injury caused by the normal imports and focusing on whether that presumed participation is to an extent which necessitates the retroactive imposition of duty.

These are flexible readings, and the necessary result could have been expressed far more clearly in the statute. What is important however, is that these readings harmonize with the purposes of retroactive duty better than a rigid construction.

On the other hand, a strict interpretation of the language to require a separate injury determination for the massive imports, raises the problem that it may be administratively impossible to measure the actual injurious effect of massive importations entered during the investigation. This might be due to the time limits on the investigation and the possibility that the investigation ends before the normal measurable market response can be ascertained. While the degree of investigative difficulty would not be a factor in the face of a clear legislative requirement, it does influence the interpretation when reasonable alternatives are available.

This result is not unfair because it still requires the application of expertise to evi-

dentiary facts regarding the massive imports, albeit not to the extent required if the massive imports were the subject of a discrete injury investigation. It is the massiveness itself which can be measured and evaluated.

The volume of the massive imports is the crucial subject. Given the underlying knowledge or pattern of dumping during an investigation and the peculiar urgency of the situation, it is sufficient if the ITC finds that the volumes will cause a recurrence of injury if retroactive duty is not imposed.

Given the express legislative intent to deter circumvention of the law by those who would increase imports during the process of investigation, it would seem that the purpose of the additional provision for critical circumstances is to prevent recurrence of the injury already being caused by previous imports. *See*, H.Rep.No. 317, 96th Cong., 1st Sess. 63 (1979).

Massive imports which arrive during the investigation and are found by the Commerce Department to have a history of dumping or to be knowingly bought at less than fair value do not have to be the subject of a separate injury analysis. Their injurious effect, coming on top of previous importations found to be injurious, may be easily and legitimately inferred. As to them, the requirement of additional findings is not meant to complicate the Commission's analysis of causation, but merely to require the Commission to determine whether the extent of massive imports will carry the injury already found to have occurred, beyond its normal duration unless retroactive duties are imposed.

On this subject, there is good reason to credit the expertise of the I.T.C. If a high degree of deference to the agency is justified anywhere, it is justified in its analysis of massive imports entered with questionable motives during an investigation. Cf. *Matsushita Electric Industrial Co., Ltd. v. United States*, 750 F.2d 927 (Fed.Cir. 1984).

The evidence of record clearly supports the determination that massive importations during the period from April through July 1983 were of such an extent that, in order to prevent the recurrence of material injury, retroactive duties had to be imposed. In April 1983 alone, importations were almost four times greater than in the entire period from April through July 1982. This being the case, the ITC's additional findings were, in these circumstances, supported by substantial evidence.

For the reasons discussed above the court finds that both determinations at issue here were supported by substantial evidence and were otherwise in accordance with the law. Accordingly, plaintiffs' motion for judgment is hereby denied and it is further

ORDERED that the Department of Commerce, International Trade Administration's final affirmative determination of sales at less than fair value of potassium permanganate from the Peoples Republic of China, 48 Fed.Reg. 57347 (December 29, 1983), and the International Trade Commission's final affirmative determination of material injury with respect to potassium permanganate from the Peoples Republic of China, 49 Fed.Reg. 3148 (January 25, 1984), be, and they hereby are, sustained in all respects.