SLIP OP. 03-151

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____
:
ZHEJIANG NATIVE PRODUCE & ANIMAL :
BY-PRODUCTS IMPORT & EXPORT CORP., ET AL., :
 :
 PLAINTIFFS, :
 :
 :
 v. : COURT NO. 02-00057
 : PUBLIC VERSION
UNITED STATES, :
 :
 DEFENDANT. :
 :
_____:

[Commerce's final antidumping determination remanded.]

Decided: November 21, 2003

 *Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Bruce M. Mitchell*, *Jeffrey S. Grimson*, *Mark E. Pardo*, *Adam M. Dambrov*), for plaintiffs Zhejiang Native Produce & Animal By-Products Import & Export Corp., Kunshan Foreign Trade Co., China (Tushu) Super Food Import & Export Corp., High Hope International Group Jiangsu Foodstuffs Import & Export Corp., National Honey Packers & Dealers Association, Alfred L. Wolff, Inc., C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA), Inc., Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and Sunland International, Inc.

 *Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Reginald T. Blades, Jr.*); *Robert LaFrankie*, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

 *Collier Shannon Scott, PLLC* (*Michael J. Coursey*, *John M. Herrmann*), for defendant-intervenors American Honey Producers Association and Sioux Honey Association.

OPINION AND ORDER

*EATON*, *Judge*: This matter is before the court on the motion for judgment upon the agency

record pursuant to USCIT R. 56.2 of plaintiffs Zhejiang Native Produce & Animal By-Products

Import & Export Corp. ("Zhejiang"), Kunshan Foreign Trade Co. ("Kunshan"), China (Tushu)

Super Food Import & Export Corp., High Hope International Group Jiangsu Foodstuffs Import &

Export Corp. ("High Hope"), National Honey Packers & Dealers Association, Alfred L. Wolff,

Inc., C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA), Inc.,

Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and

Sunland International, Inc. ("Plaintiffs").[1]  Plaintiffs challenge certain aspects of the United

States Department of Commerce, International Trade Administration's ("Commerce") final

determination of sales at less than fair value of honey from the People's Republic of China

("PRC").  *See* Honey From the P.R.C., 66 Fed. Reg. 50,608 (ITA Oct. 4, 2001) ("Final

Determination"), *as amended by* 66 Fed. Reg. 63,670; Issues and Decision Memorandum for the

Antidumping Investigation of Honey from the P.R.C., Pub. R. Doc. 216 ("Decision

Memorandum").  Jurisdiction lies under 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. §§

1516a(a)(2)(A)(i)(II) and (B)(i) (2000).


## BACKGROUND

Commerce conducted two separate investigations of honey from the PRC—the first was

---

[1]     Zhejiang, Kunshan, China (Tushu) Super Food Import & Export Corp., and High Hope are exporters of honey subject to the antidumping duty order issued in Honey From the P.R.C., 66 Fed. Reg. 63,670 (ITA Dec. 10, 2001) (am. prelim. determination and antidumping duty order) ("Amended Final Determination").  Am. Compl. ¶ 2.  C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA), Inc., Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., Sunland International, Inc., and the members of the National Honey Packers & Dealers Association, a trade association, are importers of such honey.  *Id*.

commenced in 1994 ("First Investigation") and the second in 2000 ("Second Investigation").[2] The First Investigation resulted in an affirmative preliminary determination of sales at less than fair value. *See* Honey From the P.R.C., 60 Fed. Reg. 14,725 (ITA Mar. 20, 1995) (notice of prelim. determination). Subsequently, Commerce entered into a suspension agreement with the government of the PRC. *See* Honey From the P.R.C., 60 Fed. Reg. 42,521 (ITA Aug. 16, 1995) (notice of suspension of investigation); Agreement Suspending the Antidumping Investigation on Honey From the P.R.C., Aug. 2, 1995, U.S.-P.R.C., *reprinted in* 60 Fed. Reg. at 42,522–27 ("Suspension Agreement").[3] The Suspension Agreement recited that it was entered into "pursuant to the provisions of Section 734(*l*) of the Tariff Act of 1930, as amended" (19 U.S.C. § 1673c(*l*)), and that pursuant to it, "the Department shall suspend its antidumping investigation with respect to honey produced in the PRC . . . ." Suspension Agreement, 60 Fed. Reg. at 42,522–23. The Suspension Agreement also stated that it was entered into "[f]or the purpose of encouraging free and fair trade in honey, establishing more normal market relations, and preventing the suppression or undercutting of price levels of the domestic product . . . ." *Id*. at

---

[2]     The Second Investigation, which resulted in the Final Determination at issue here, covered

> natural honey, artificial honey containing more than 50 percent natural honey by weight, preparations of natural honey containing more than 50 percent natural honey by weight, and flavored honey. The subject merchandise includes all grades and colors of honey whether in liquid, creamed, comb, cut comb, or chunk form, and whether packaged for retail or in bulk form.

Final Determination, 66 Fed. Reg. at 50,610 ("Subject Merchandise").

[3]     The scope of the Suspension Agreement covered products that were nearly identical to the Subject Merchandise. *See* Suspension Agreement, 60 Fed. Reg. at 42,522.

42,522.

The Suspension Agreement included terms providing for the establishment of export

limits,[4] a reference price,[5] and certain action the government of the PRC would be required to

take in order to effectively restrict the volume of exports of honey to the United States, including

the establishment of a quota certification program.[6] *See* Suspension Agreement, 60 Fed. Reg. at

---

[4]     The Suspension Agreement stated that "the Government of the PRC will restrict the volume of direct or indirect exports to the United States of honey products from all PRC producers/exporters, subject to the terms and provisions set forth [herein]." Suspension Agreement, 60 Fed. Reg. at 42,522.

[5]     The reference price, issued quarterly by Commerce, represented a price below which the merchandise subject to the Suspension Agreement could not be sold. The Suspension Agreement provided a formula by which Commerce calculated the reference price:

> The reference price equals the product of 92 percent and the weighted-average of the honey unit import values from all other countries for the most recent six months of data available at the time the reference price is calculated. The source of the unit import values will be publicly available United States trade statistics from the United States Bureau of the Census.

Suspension Agreement, 60 Fed. Reg. at 42,524. In 1998, the Suspension Agreement was amended with respect to the reference price. By this amendment, the base period for calculating reference prices changed "from the most recent six months of data to the most recent three months of data." Agreement Suspending the Antidumping Investigation on Honey From the P.R.C., 63 Fed. Reg. 20,578, 20,578 (ITA Apr. 27, 1998) (notice of amendment to the Suspension Agreement).

[6]     The quota certificate program in place while the Suspension Agreement was in effect involved several steps carried out by Commerce and various departments of the PRC government, including the China Chamber of Commerce of Importers and Exporters of Foodstuffs, Native Produce and Animal By-Products (the "Chamber"), the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC"), and departments within MOFTEC, such as the Foreign Trade Administration Department ("FTA"), and the Quota Licensing Board ("QLB"). First, Commerce established and notified MOFTEC of a quota for honey exported to the United

(continued...)

42,523–24. The Suspension Agreement was in effect from August 16, 1995, through August 16,

2000. *See* Termination of Suspended Antidumping Duty Investigation on Honey From the

P.R.C., 65 Fed. Reg. 46,426 (ITA July 28, 2000) ("Termination").

On July 3, 2000, Commerce gave notice that it would conduct a five-year review of the

suspended antidumping investigation.[7] *See* Noitce [sic] of Initiation of Five-Year ("Sunset")

Revs., 65 Fed. Reg. 41,053 (ITA July 3, 2000). On July 28, 2000, Commerce terminated this

investigation "[b]ecause no domestic interested party responded to the notice of initiation by the

---

[6](...continued)
States from the PRC. Then, through a bidding process conducted within the PRC, the quota was allocated among the largest honey exporters. Next, those exporters were notified by the FTA of their eligibility for an export license. Once it received a quota allocation and notice that it was eligible for an export license, the exporter could enter a contract for the sale of honey to the United States. If a contract for sale was entered into by the exporter, the Chamber reviewed the contract price to ensure that it complied with the reference price. Then, to obtain an export license, the exporter submitted various documentation to the QLB, including the FTA notice of quota allocation, the sales contract, and the notice of eligibility for an export license from the Chamber. On receiving the export license, the exporter could apply for a quota certificate. Finally, the PRC Customs Service authorized exportation after reviewing the license, quota certificate, and other appropriate documentation. *See* Honey From the P.R.C., 66 Fed. Reg. 24,101, 24,102–03 (ITA May 11, 2001) ("Preliminary Determination"), *as amended by* Honey From the P.R.C., 66 Fed. Reg. 40,191 (Aug. 2, 2001) ("Amended Preliminary Determination") (discussing whether existence of export licensing program was consistent with Commerce's determination of separate rates); *see also* Letter from Akin, Gump, Strauss, Hauer & Feld, LLP to Commerce of 4/12/01, Pub. R. Doc. 120 at 3–8.

[7]        By statute, Commerce shall conduct a review of an investigation, suspended by agreement, five years after the date on which notice of such suspension was published in order to determine "whether . . . termination of the investigation suspended under section . . . 1673c of [title 19] would be likely to lead to continuation or recurrence of dumping . . . and of material injury." 19 U.S.C. § 1675(c)(1); *see also* 19 U.S.C. § 1675a(c) (listing factors Commerce considers in conducting sunset review).

applicable deadline . . . ."  Termination, 65 Fed. Reg. at 46,426.[8]


Following the expiration of the Suspension Agreement by its terms on August 16, 2000,

the Second Investigation was commenced.  On September 29, 2000, the domestic honey industry

filed a petition with Commerce and the United States International Trade Commission ("ITC"),

alleging, among other things, that it was being injured as a result of less than fair value sales of

honey from Argentina and the PRC.  *See* Antidumping and Countervailing Duty Pet., Honey

from Arg. and the P.R.C. (Sept. 29, 2000), Pub. R. Doc. 1.  Thereafter, Commerce initiated its

preliminary investigation.  *See* Honey From Arg. & the P.R.C., 65 Fed. Reg. 65,831 (ITA Nov. 2,

2000) (notice of initiation of antidumping duty investigation).  Commerce identified the period of

investigation ("POI") as January 1, 2000, through June 30, 2000, a period during which the

Suspension Agreement was in effect.  *See* Prelim. Determination, 66 Fed. Reg. at 24,102.  In

November 2000, the ITC determined that there was a reasonable indication that the domestic

honey industry was materially injured by reason of imports of honey from Argentina and the

PRC.  *See* Honey From Arg. & China, 65 Fed. Reg. 69,573 (ITC Nov. 17, 2000) (notice of

prelim. injury determination); Honey From Arg. & China, USITC Pub. No. 3369, Inv. Nos. 701-

TA-402 and 731-TA-892-893 (Nov. 2000) ("ITC Preliminary Determination").  By letter dated

February 23, 2001, the petitioners alleged that there was a reasonable basis to believe or suspect

---

[8]        Where no interested party responds to the notice of initiation of a five-year
review, Commerce "shall issue a final determination, within 90 days after the initiation of a
review, revoking the order or terminating the suspended investigation to which such notice
relates."  19 U.S.C. § 1675(c)(3)(A); 19 C.F.R. § 351.218(d)(1)(iii)(B) (2000); *see also*
Statement of Administrative Action, accompanying H.R. REP. NO. 103-826(I), at 880 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 4040, 4206 ("SAA") (stating provision intended to "eliminate
needless reviews").

that critical circumstances existed with respect to imports of honey from the PRC. *See* Letter

from Collier Shannon Scott, PLLC to Commerce of 2/23/01, Pub. R. Doc. 76. On May 11, 2001,

Commerce published its affirmative preliminary determination of sales at less than fair value of

honey from the PRC.[9] *See* Prelim. Determination, 66 Fed. Reg. at 24,101.

In October 2001, Commerce made its final affirmative antidumping determination, which

contained affirmative determinations of critical circumstances with respect to Zhejiang, High

Hope, Kunshan, and the PRC-wide entity.[10] *See* Final Determination, 66 Fed. Reg. at 50,610.

The Second Investigation resulted in Commerce's determination that honey from the PRC "is

being sold, or is likely to be sold, in the United States at less than fair value," *id.* at 50,608, and

the assessment of antidumping duty margins ranging between 25.88% and 183.80%. *See* Am.

Final Determination, 66 Fed. Reg. at 63,672.

By this action, Plaintiffs challenge (1) Commerce's calculation of antidumping duty

margins, (2) its determination with respect to critical circumstances, and (3) the reliability of

---

[9] After the correction of certain ministerial errors, Commerce preliminarily determined that critical circumstances were present with respect to High Hope and the PRC-wide entity, but not Zhejiang. *See* Prelim. Determination, 66 Fed. Reg. at 24,108; Am. Prelim. Determination, 66 Fed. Reg. at 40,192.

[10] Here, the PRC-wide entity is comprised of unnamed companies in the PRC that export honey to the United States and that failed to respond to Commerce's questionnaires. Commerce applied a single "PRC-wide rate" to all such exporters "based on . . . [the] presumption that those respondents who failed to demonstrate entitlement to a separate rate constitute a single enterprise under common control by the government of the PRC." Prelim. Determination, 66 Fed. Reg. at 24,104 (citing Synthetic Indigo From the P.R.C., 65 Fed. Reg. 25,706, 25,707 (ITA May 3, 2000) (final determination)).

certain sources of valuation data.  For the reasons set forth below, the court remands the Final

Determination for further action in conformity with this opinion.


STANDARD OF REVIEW

When reviewing a final determination in an antidumping duty investigation, "[t]he court

shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by

substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. §

1516a(b)(1)(B)(i); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed.

Cir. 2003) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (2000)) ("As  required by statute, [the court]

will sustain the agency's antidumping determinations unless they are 'unsupported by substantial

evidence on the record, or otherwise not in accordance with law.'").  "Substantial evidence is

'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Huaiyin*, 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The existence of substantial evidence is determined "by considering the record as a whole,

including evidence that supports as well as evidence that 'fairly detracts from the substantiality of

the evidence.'" *Id*. (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir.

1984)).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence."

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

DISCUSSION

I.      *Commerce's antidumping determination using the nonmarket economy methodology prescribed in 19 U.S.C. § 1677b(c) is in accordance with law and supported by substantial evidence*

Commerce has the duty to "determine[] [whether] a class or kind of merchandise is being, or is likely to be, sold in the United States at less than its fair value . . . ." 19 U.S.C. § 1673(1); *see also* 19 U.S.C. § 1677(34) (defining "dumping" as "the sale or likely sale of goods at less than fair value."). To make this determination, Commerce must compare the normal value of the foreign like product in the home or third country market to the imported product's export price or constructed export price. *See* 19 U.S.C. § 1677b(a); 19 C.F.R. § 351.401(a).

In the market economy context, normal value is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price . . . ." 19 U.S.C. § 1677b(a)(1)(B)(i); *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1379 n.1 (Fed. Cir. 2001). In the nonmarket economy ("NME")[11] context, however, normal value may be determined in accordance with 19 U.S.C. § 1677b(c)(1), which provides that "[i]f . . . the subject merchandise is exported from a nonmarket economy country, and . . . [Commerce] finds that available information does not permit the normal value of the subject merchandise to be determined [under 19 U.S.C. § 1677b(a)]," then Commerce

---

[11]     An NME country is defined as "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. Except as provided in [19 U.S.C. § 1677b(c)(2)[12]], the valuation of the factors of production shall be based on the *best available information* regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1) (emphasis added); *Shakeproof Assembly Components*, 268 F.3d at 1379 n.1; *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1445 (Fed. Cir. 1994) ("Simply put, if the ITA cannot determine FMV pursuant to the general provisions of § 1677b(a), then the ITA must use the factors of production methodology to *estimate* FMV for the merchandise in question.") (emphasis in original).[13] Commerce enjoys wide, although not unlimited, discretion

---

[12]      This provision states:

If [Commerce] finds that the available information is inadequate for purposes of determining the normal value of subject merchandise under paragraph (1), the administering authority shall determine the normal value on the basis of the *price* at which merchandise that is—

(A) comparable to the subject merchandise, and

(B) produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country,

is *sold* in other countries, including the United States.

19 U.S.C. § 1677b(c)(2) (emphasis added).

[13]      Title 19 U.S.C. § 1677b(c)(3) sets out a non-exhaustive list of relevant factors of production, including "hours of labor required, . . . quantities of raw materials employed, . . . amounts of energy and other utilities consumed, and . . . representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3). In valuing such factors of production, Commerce "shall

(continued...)

in determining what information is "best" in valuing the factors of production. *See Nation Ford*

*Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (citing *Lasko Metal Prods.,*

*Inc.*, 43 F.3d at 1446; *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660,

665 (Fed. Cir. 1992); *Magnesium Corp. of Am. v. United States*, 166 F.3d 1364, 1372 (Fed. Cir.

1999)); *id*. ("Whether such analogous information from the surrogate country is 'best' will

necessarily depend on the circumstances, including the relationship between the market structure

of the surrogate country and a hypothetical free-market structure of the NME producer under

investigation.").

 

Export price is determined in accordance with the methodology set forth in 19 U.S.C. §

1677a(a):

> [T]he [export price is the] price at which the subject merchandise
> is first sold (or agreed to be sold) before the date of importation by
> the producer or exporter of the subject merchandise outside of the
> United States to an unaffiliated purchaser in the United States or to
> an unaffiliated purchaser for exportation to the United States, as
> adjusted under [19 U.S.C. § 1677a(c)].

19 U.S.C. § 1677a(a); *see also* SAA at 822 ("If the first sale to an unaffiliated purchaser in the

United States, or to an unaffiliated purchaser for export to the United States, is made by the

producer or exporter in the home market prior to the date of importation, then Commerce will

---

[13](...continued)
utilize, to the extent possible, the prices or costs of factors of production in one or more market
economy countries that are . . . at a level of economic development comparable to that of the
nonmarket economy country, and . . . significant producers of comparable merchandise." 19
U.S.C. § 1677b(c)(4)(A)–(B); *see also Sigma Corp. v. United States*, 117 F.3d 1401, 1408 (Fed.
Cir. 1997) ("[T]he process of constructing foreign market value for a producer in a nonmarket
economy country is difficult and necessarily imprecise . . . .").

base its calculation on export price."). The dumping margin, determined by Commerce, is "the amount by which the normal value exceeds the export price . . . of the subject merchandise." 19 U.S.C. § 1677(35)(A). By these procedures Commerce endeavors to determine antidumping duty margins as accurately as possible. *See Lasko Metal Prods. Inc.*, 43 F.3d at 1446 (quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1991 (Fed. Cir. 1991)) ("The Act sets forth procedures in an effort to determine margins 'as accurately as possible.'"); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("It is the duty of ITA to determine dumping margins as accurately as possible.") (internal quotation omitted).

Here, in determining whether the Subject Merchandise was being sold or was likely to be sold at less than fair value in the United States, Commerce found, as it has in the past, that the PRC was an NME country,[14] and calculated normal value using the NME methodology found in 19 U.S.C. § 1677b(c)(1). *See* Prelim. Determination, 66 Fed. Reg. at 24,102 ("When the Department is investigating imports from an NME, [19 U.S.C. § 1677b(c)(1)] directs us to base the normal value (NV) on the NME producer's factors of production, valued in a comparable market economy that is a significant producer of comparable merchandise."). In doing so,

---

[14]     "The Department has treated the PRC as a non-market economy . . . country in all past antidumping investigations." Prelim. Determination, 66 Fed. Reg. at 24,102 (citing Bulk Aspirin from the P.R.C., 65 Fed. Reg. 33,805 (ITA May 25, 2000) (final determination); Certain Non-Frozen Apple Juice Concentrate from the P.R.C., 65 Fed. Reg. 19,873 (ITA Apr. 13, 2000) (final determination)). "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority." 19 U.S.C. § 1677(18)(C)(i). Here, Plaintiffs do not dispute Commerce's designation of the PRC as an NME country.

Commerce relied on data from India in valuing the factors of production.[15] *Id.* at 24,105. To

calculate export price, Commerce used data from actual sales of the Subject Merchandise directly

to unaffiliated purchasers in the United States. *Id.* Commerce further calculated weighted-

average export prices, pursuant to 19 U.S.C. § 1677f-1(d)(1)(A)(i).[16] *Id.* In the Final

Determination, Commerce made an affirmative dumping finding and assigned antidumping duty

margins ranging between 25.88% (for Zhejiang) and 183.80% (for the PRC-wide entity). *See*

Am. Final Determination, 66 Fed. Reg. at 63,672. In addition, Commerce found the following

with respect to the relevance of the Suspension Agreement, and in particular the reference price,

to its finding of sales at less than fair value:

> The reference prices issued by the Department under the
> suspension agreement were established to provide minimum
> selling prices for exports of honey to the United States. . . . These
> reference prices were not formulated to eliminate completely all
> sales at less than fair value but rather were designed to meet the
> statutory criteria for [19 U.S.C. § 1673c(*l*)] agreements: the
> elimination of price suppression or undercutting.[17] The

---

[15]     The factors of production as reported by certain PRC honey producers and their
suppliers included: raw honey, electricity, coal, water, labor, beeswax, truck freight rates, rail
transportation, inland water transportation, brokerage and handling, factory overhead, selling,
general, and administrative expenses, and packing materials. *See* Prelim. Determination, 66 Fed.
Reg. at 24,106.

[16]     Title 19 U.S.C. § 1677f-1(d)(1)(A)(i) states that Commerce "shall determine
whether the subject merchandise is being sold in the United States at less than fair value . . . by
comparing the weighted average of the normal values to the weighted average of the export
prices (and constructed export prices) for comparable merchandise . . . ." 19 U.S.C. § 1677f-
1(d)(1)(A)(i).

[17]     This rule governing suspension agreements with NME countries, states that
Commerce

> may suspend an investigation under this part upon acceptance of an

(continued...)

agreement did not prohibit the PRC producers/exporters from selling subject merchandise at prices higher than the reference prices in order to eliminate completely any sales at less than fair value. Indeed, the language of the agreement itself did not address the issue of sales at less than fair value, nor did it require PRC producers/exporters to sell honey to the United States at non-dumped prices.

Decision Mem., Pub. R. Doc. 216 at 6.

Plaintiffs argue that Commerce failed to use the "best available information," as 19 U.S.C. § 1677b(c)(1) requires, in determining normal value. Plaintiffs contend that since their U.S. sales of honey complied with the reference price contained in the Suspension Agreement, Commerce's determination that these sales were made at less than fair value is "*prima facie* evidence that the data selected by Commerce to make its dumping calculation was unreasonable (and not the 'best available information')." *See* Br. Supp. Pls.' Mot. J. Agency R. ("Pls.' Mem.") at 14–15 (citation omitted). According to Plaintiffs, the inclusion of the reference price provision in the Suspension Agreement necessarily prevented the special rule governing suspension

[17](...continued)
agreement with a nonmarket economy country to restrict the volume of imports into the United States of the merchandise under investigation only if the administering authority determines that—

(A) such agreement satisfies the requirements of subsection (d) of this section [relating to the public interest, effective monitoring, and the opportunity for comments by exporters], and

(B) will prevent the suppression or undercutting of price levels of domestic products by imports of the merchandise under investigation.

19 U.S.C. § 1673c(*l*)(1).

agreements with NME countries (19 U.S.C. § 1673c(*l*)) from being the authority for the

Suspension Agreement. Rather, Plaintiffs insist that, even though the Suspension Agreement

states it was entered into pursuant to 19 U.S.C. § 1673c(*l*), the presence of the reference price

requires a finding that the Suspension Agreement was entered into pursuant to 19 U.S.C. §

1673c(b),[18] and that the Suspension Agreement was thus designed to "eliminate completely" any

dumping of the Subject Merchandise. *Id*. at 13 ("[T]he 'special rule' [found in 19 U.S.C. §

1673c(*l*)] for nonmarket economy suspension agreements only establishes new criteria for

*quantitative* restrictions. Any price restrictions must still comply with the standard requirements

for all suspension agreements, which include setting price levels that eliminate less than fair

value sales." (emphasis in original) (citing 19 U.S.C. § 1673c(b)(2)); Pls.' Reply Br. ("Pls.'

Reply") at 4 ("[U]nder the plain language of the statute, any *price* based limitations included in

an NME suspension agreement would not be subject to the criteria established by 19 U.S.C. §

---

[18]     By statute, Congress authorized Commerce to suspend investigations where an agreement is entered for the purpose of eliminating completely sales at less than fair value:

> The administering authority may suspend an investigation if the exporters of the subject merchandise who account for substantially all of the imports of that merchandise agree—
>
> > (1) to cease exports of the merchandise to the United States within 6 months after the date on which the investigation is suspended, or
> >
> > (2) to revise their prices to eliminate completely any amount by which the normal value of the merchandise which is the subject of the agreement exceeds the export price (or the constructed export price) of that merchandise.

19 U.S.C. § 1673c(b).

1673c(*l*)(1) because this provision does not address price restrictions. Instead, a price based

restriction would need to comply with the requirements of 19 U.S.C. § 1673c(b), which

specifically governs suspension agreements based on price limitations.") (emphasis in original).

Plaintiffs contend that the legislative history surrounding the enactment of 19 U.S.C. § 1673c(*l*)

supports this argument.[19] Plaintiffs further claim that the Suspension Agreement's reference to

19 U.S.C. § 1673c(f)(2)(A)[20] is also evidence that it was intended to eliminate sales at less than

---

[19]     In this regard, Plaintiffs direct the court's attention to the legislative history accompanying the enactment of 19 U.S.C. § 1673c(*l*):

> The Senate amendment provides a special rule under [19 U.S.C. § 1673c] for suspending antidumping investigations of imports from non-market economy countries based on quantitative restraint agreements. Such agreements must satisfy the general requirements for suspension agreements, including public interest criteria, and prevent suppression or undercutting of domestic price levels.

H.R. CONF. REP. NO. 100-576, at 593 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1626.

[20]     Title 19 U.S.C. § 1673c(f)(2)(A) provides:

> If the agreement accepted by the administering authority is an agreement described in subsection (b) [relating to agreements to eliminate completely sales at less than fair value or to cease exports of merchandise], then—
>
>> (i) notwithstanding the affirmative preliminary determination required under paragraph (1)(A), the liquidation of entries of subject merchandise shall not be suspended under [19 U.S.C. § 1673b(d)(2)],
>>
>> (ii) if the liquidation of entries of such merchandise was suspended pursuant to a previous affirmative preliminary determination in the same case with respect to such merchandise, that suspension of liquidation shall terminate, and

(continued...)

fair value because by its terms, 19 U.S.C. § 1673c(f)(2)(A) applies if the suspension agreement at issue "is [one] described in [19 U.S.C. § 1673c(b)]," i.e., one to eliminate the occurrence of dumping or to cease exports altogether. 19 U.S.C. § 1673c(f); *see* Pls.' Mem. at 13. Thus, based on the premise that the Suspension Agreement is an agreement to eliminate dumping, Plaintiffs claim that by failing to take the reference price into consideration in calculating normal value, Commerce did not determine normal value based on the best available information and thus failed in its duty to calculate margins as accurately as possible. *See* Pls.' Mem. at 15 (citation omitted).

The United States ("Government") on behalf of Commerce argues that Commerce's use of its standard NME methodology to calculate antidumping duty margins is in accordance with law and supported by substantial evidence. The Government contends that the Suspension Agreement is irrelevant for purposes of calculating antidumping duty margins because the purpose of the reference price provision was to prevent price suppression in the United States market, not to eliminate the dumping of honey. Def.'s Opp'n Pls.' Mot. J. Agency R. ("Def.'s Resp.") at 22. The Government asserts that this is clear from the Suspension Agreement itself, which recites that it was entered into pursuant to 19 U.S.C. § 1673c(*l*). *See id.* at 24–25. Furthermore, the Government argues that "[t]he fact that the reference prices were based upon

---

[20](...continued)

> (iii) the administering authority shall refund any cash deposit and release any bond or other security deposited under [19 U.S.C. § 1673b(d)(1)(B)].

19 U.S.C. § 1673c(f)(2)(A)(i)–(iii).

the average unit value of honey imports into the United States from all other countries, and not

from prices or costs associated with [the calculation of] [normal value] (in this case, from the

surrogate country India) demonstrates that these prices were not intended to eliminate 'less than

fair value' sales." *Id*. at 26.  Thus, the Government maintains that "Commerce . . . correctly

calculated antidumping margins in this case based upon the actual price and 'factor' information

submitted on the record, and not based upon irrelevant 'reference prices' contained in the expired

suspension agreement." *Id*. at 26–27.


The court finds Commerce's antidumping determination and calculation of antidumping

duty margins to be in accordance with law and supported by substantial evidence.  As the PRC is

an NME country, Commerce applied the NME methodology pursuant to 19 U.S.C. § 1677b(c) to

determine normal value for Zhejiang, Kunshan, and Inner Mongolia Autonomous Region Native

Produce & Animal By-Products Import & Export Corp. ("Inner Mongolia"), which represented,

by volume, the three largest exporters of the Subject Merchandise during the POI.  Prelim.

Determination, 66 Fed. Reg. at 24,101.  Commerce selected and valued the factors of production

using data from India and explained its calculations.  *See id*. at 24,105–06; *see generally* Prelim.

Analysis Mem. of 5/4/01, Conf. R. Docs. 47–49; Verification Mem. of 7/72/01, Conf. R. Docs.

64–66; Final Analysis Mem. of 9/26/01, Conf. R. Docs. 73–75; Am. Final Analysis Mem. of

11/28/01, Conf. R. Doc. 78.  Commerce determined export price by referring to sales and pricing

information submitted by Plaintiffs regarding sales made to unaffiliated purchasers in the United

States during the POI.  *See* Prelim. Determination, 66 Fed. Reg. at 24,105; *see also* Prelim.

Analysis Mem., Conf. R. Docs. 47–49 at 1–2; Section C & D Questionnaire Resps. of Inner

Mongolia, Conf. R. Doc. 22, Ex. C-1; Kunshan, Conf. R. Doc. 23, Ex. C-1; Zhejiang, Conf. R.

Doc. 24, Ex. C-1 (U.S. sales listings). Plaintiffs' questionnaire responses indicate that they freely

negotiated the contract price for the sale of honey with U.S. purchasers.[21] *See, e.g.*, Kunshan

Section A Supp. Questionnaire Resp., Pub. R. Doc. 73 at 9 ("[P]rices with U.S. customers are

determined as a result of negotiations with those U.S. customers."). Commerce's comparison of

normal value and export price led to the conclusion that the Subject Merchandise was being sold

or was likely to be sold at less than fair value in the United States. The mathematical accuracy of

Commerce's computation of antidumping duty margins is not in dispute. *See Lasko Metal*

*Prods. Inc.*, 43 F.3d at 1446.


What is in dispute is whether Commerce used the best available information in making

the comparison. The court does not agree with Plaintiffs' argument that Commerce erred by

finding Plaintiffs' U.S. sales were made at less than fair value where those sales were made in

compliance with the Suspension Agreement. First, nothing in the statutes or regulations that

guide Commerce's antidumping determination in the NME context requires (or for that matter

permits) Commerce to consider the terms of a suspension agreement. *See* 19 U.S.C. §§

1677b(c), 1677a(a); 19 C.F.R. § 351.408(a). Second, contrary to Plaintiffs' contention, the

inclusion of the reference price does not require the court to find that the Suspension Agreement

was entered into pursuant to 19 U.S.C. § 1673c(b). While 19 U.S.C. § 1673c(*l*) authorizes

Commerce to enter into suspension agreements that restrict the volume of imports with NME

---

[21]     Following these negotiations, the Chamber reviewed the sales contracts to
monitor compliance with the reference price contained in the Suspension Agreement.

countries, subsection (*l*) does not provide any guidance with respect to how volume restriction is to be achieved, the terms that may or may not be included in an agreement to restrict the volume of imports, or the permissible means by which prevention of the "suppression or undercutting of price levels of domestic products by imports" might be realized. Certainly, the statute cannot be read to restrict an agreement to a single term related only to quantity, and to forbid a term dealing with price. Rather, it appears that the terms of such agreements are products of negotiation, and are designed to give effect to the suspension agreement's purpose—here, to prevent the suppression or undercutting of price levels of the domestic product. *See, e.g.*, *Bethlehem Steel Corp. v. United States*, 25 CIT __, __, 146 F. Supp. 2d 927, 928 (2001) (noting that, in general, a suspension agreement is "a unique form of settlement agreement"); *see also Bethlehem Steel Corp. v. United States*, 25 CIT __, __, 159 F. Supp. 2d 730, 750 n.38 (noting "negotiated 'reference price'" in subsection (c) suspension agreement at issue was price below which exporters were prohibited from selling steel in United States).[22] Third, the language of the Suspension Agreement clearly provided that its purpose was to prevent price suppression and undercutting and to restrict the volume of imports, not to eliminate dumping directly. Suspension Agreement, 60 Fed. Reg. at 42,522. There are numerous references to this purpose

---

[22]     In addition, it is worth noting that reference prices are generally used in suspension agreements entered pursuant to 19 U.S.C. §§ 1673c(*l*) and (c), but not (b). *See, e.g.*, *Elkem Metals Co. v. United States*, 23 CIT 170, 171, 44 F. Supp. 2d 288, 289 (1999) ("In this [subsection (*l*)] Agreement, the Government of Ukraine agreed to limit its exports of silicomanganese to the United States and ensure that those exports within the agreed quantitative limits were sold at or above a prescribed reference price."); *Bethlehem Steel*, 25 CIT at __, 159 F. Supp. 2d at 750 n.38 (reference price included in subsection (c) suspension agreement); *U.S. Steel Group v. United States*, 25 CIT __, __, 162 F. Supp. 2d 676, 680 (2001) (reference price included in subsection (*l*) agreement entered with the Ministry of Trade of the Russian Federation).

in the Suspension Agreement.[23]   The most convincing evidence that the reference price utilized

in the Suspension Agreement was not designed to eliminate the dumping margin, however, is

that it was arrived at by using none of the tools used in an antidumping case, i.e., a fair

comparison of the normal value and export price.  Rather, it was determined by reference to a

number representing 92% of "the weighted-average of the honey unit import values from all

other countries."  *Id*. at 42,524.  Subsection (b) agreements, by contrast, normally include

provisions relating to the establishment of normal value.[24]

---

[23]        *See, e.g.*, Suspension Agreement, 60 Fed. Reg. at 42,524 ("The Government of the PRC will restrict the volume of direct or indirect exports of subject merchandise by means of semi-annual quota allocations and Quota Certificates."); *id*. ("MOFTEC shall provide to the Department a report identifying each quota recipient and the volume of quota which each recipient has been accorded . . . ."); *id*. ("Before it issues a Quota Certificate, MOFTEC will ensure that the Relevant Period's quota volume is not exceeded and that the price for the subject merchandise is at or above the reference price."); *id*. ("The Government of the PRC shall take action, including the imposition of penalties, as may be necessary to make effective the obligations resulting from the price restrictions, export limits, and Quota Certificates."); *id*. ("On or after the effective date of this Agreement, the United States shall require presentation of a Quota Certificate as a condition for entry of subject merchandise into the United States.  The United States will prohibit the entry of any subject merchandise not accompanied by a Quota Certificate.").  Nowhere does the Suspension Agreement mention the elimination of dumping.

[24]        *See, e.g.*, Dynamic Random Access Memory Semiconductors of 256 Kilobits & Above from Japan, 51 Fed. Reg. 28,396, 28,398  (ITA Aug. 7, 1986) (suspension of investigation) (pre-URAA agreement where parties agreed to "make any necessary price revisions to eliminate completely any amount by which the foreign market value of its merchandise exceeds the United States price of its merchandise subject to this Agreement."); Sodium Azide From Japan, 62 Fed. Reg. 973, 974 (ITA Jan. 7, 1997) (suspension of antidumping duty investigation) (indicating agreement among signatories not to sell merchandise at less than normal value as determined by Commerce based on cost information from the period of investigation); Certain Cut-to-Length Carbon Steel Plate From S. Afr., 62 Fed. Reg. 61,751, 61,753 (ITA Nov. 19, 1997) (suspension agreement) (defining normal value for purposes of the agreement); Steel Wire Rod From Venez., 63 Fed. Reg. 8948, 8952 (ITA Feb. 23, 1998) (suspension of antidumping duty investigation) (describing calculation of suspension agreement normal values).

Moreover, the legislative history surrounding 19 U.S.C. § 1673c(*l*) does not strengthen Plaintiffs' position. This history merely echoes the language of 19 U.S.C. § 1673c(*l*). Subsection (*l*) permits Commerce to enter into agreements with NME countries "to restrict the volume of imports into the United States of the merchandise under investigation only if [Commerce] determines" certain statutory criteria have been met, i.e., that the agreement "will prevent the suppression or undercutting of price levels of domestic products by imports of the merchandise under investigation," as well as comply with the public interest requirements. 19 U.S.C. § 1673c(*l*)(1)(A)–(B). Similarly, the legislative history states that this provision authorizes the "suspen[sion] of antidumping investigations of imports from non-market economy countries based on quantitative restraint agreements," and further notes that "[s]uch agreements must satisfy the general requirements for suspension agreements, including public interest criteria, and prevent suppression or undercutting of domestic price levels." H.R. CONF. REP. NO. 100-576, at 593, *reprinted in* 1988 U.S.C.C.A.N. at 1626. Nothing in the statute or legislative history dissuades the court from concluding that the goal of the Suspension Agreement, the restriction of the volume of imports and the prevention of price suppression and undercutting, may lawfully be achieved through the use of a reference price.

Finally, the court finds that the Suspension Agreement's reference to 19 U.S.C. § 1673c(f)(2)(A) does not in itself establish that the agreement was entered into to eliminate dumping. Rather, this reference was likely included because there is no statutory provision specifically directed to agreements concluded in the NME context by which the suspension of liquidation may be terminated. *See* 19 U.S.C. § 1673c(f)(2)(A)(ii).

As Commerce has complied with the statutes guiding its determinations with respect to the calculation of normal value in the NME context, and the calculation of export price, and as there is no dispute as to the mathematical accuracy of the estimated margins as reported in the Amended Final Determination, the court finds that Commerce's calculation of antidumping duty margins is in accordance with law and supported by substantial evidence. *See Lasko Metal Prods Inc.*, 43 F.3d at 1446; *NTN Bearing Corp.*, 74 F.3d at 1208.

II.     *Commerce's final affirmative critical circumstances determination is in accordance with law and supported by substantial evidence*

Title 19 U.S.C. § 1673d(a)(3) governs Commerce's final critical circumstances determinations.[25] This provision requires that, where Commerce makes an affirmative final antidumping determination and the presence of critical circumstances is alleged under 19 U.S.C. § 1673b(e),[26] Commerce's final determination "shall also contain a finding" of whether *either* (1)

---

[25]     The critical circumstances statute was promulgated "to provide prompt relief to domestic industries suffering from large volumes of, or a surge over a short period of, imports" and was designed to serve as a deterrent to "exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by [Commerce]." H.R. REP. NO. 96-317, 96th Cong., 1st Sess. at 63 (1979); *see Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 23 CIT 88, 112 n.38, 44 F. Supp. 2d 229, 252 n.38 (1999) (quoting S. REP. NO.103-412, 103d Cong., 2d Sess., at 38 (1994) ("This provision is 'designed to address situations where imports have surged as a result of the initiation of an antidumping or countervailing duty investigation, as exporters and importers seek to increase shipments of the merchandise subject to investigation into the importing country before an antidumping or countervailing duty order is imposed.'")).

[26]     Title 19 U.S.C. § 1673b(e)(1) provides:

> If a petitioner alleges critical circumstances in its original petition, or by amendment at any time more than 20 days before the date of

(continued...)

there is a history of dumping and material injury by reason of dumped imports, *or* (2) the person

by whom, or for whose account, the merchandise was imported knew or should have known that

the exporter was selling the subject merchandise at less than its fair value and that there would be

material injury by reason of such sales, *and* (3) there have been massive imports of the subject

merchandise over a relatively short period. *See* 19 U.S.C. § 1673d(a)(3)(A)–(B); 19 C.F.R. §

351.206(h).[27] An affirmative critical circumstances determination permits the retroactive

---

[26](...continued)
> a final determination by the administering authority, then the
> administering authority shall promptly (at any time after the
> initiation of the investigation under this part) determine, on the
> basis of the information available to it at that time, whether there is
> a reasonable basis to believe or suspect that—
>
> (A) (i) there is a history of dumping and material injury by reason
> of dumped imports in the United States or elsewhere of the subject
> merchandise, or
>
> (ii) the person by whom, or for whose account, the merchandise
> was imported knew or should have known that the exporter was
> selling the subject merchandise at less than its fair value and that
> there was likely to be material injury by reason of such sales, and
>
> (B) there have been massive imports of the subject merchandise
> over a relatively short period.

19 U.S.C. § 1673b(e)(1)(A)–(B).

[27]      Commerce's massive imports regulation provides in relevant part:

> (1) In determining whether imports of the subject merchandise
> have been massive under [19 U.S.C. §§ 1671d(a)(2)(B) or
> 1673d(a)(3)(B)], the Secretary normally will examine:
>
>> (i) The volume and value of the imports;
>>
>> (ii) Seasonal trends; and

(continued...)

imposition of antidumping duties "on merchandise entered up to 90 days before the imposition of

provisional measures."  19 C.F.R. § 351. 206(a); *see also* 19 U.S.C. § 1673d(c)(4)(A)–(B).[28]

_____

[27](...continued)

> (iii) The share of domestic consumption accounted
> for by the imports.

> (2) In general, unless the imports during the "relatively short
> period" . . . have increased by at least 15 percent over the imports
> during an immediately preceding period of comparable duration,
> the Secretary will not consider the imports massive.

19 C.F.R. § 351.206(h).

[28]        This provision states:

> If the determination of the administering authority under [19
> U.S.C. § 1673d(a)(3)] is affirmative, then the administering
> authority shall—

> (A) in cases where the preliminary determinations by the
> administering authority under [19 U.S.C. § 1673b(b), relating to
> dumping and (e)(1), relating to critical circumstances] were both
> affirmative, continue the retroactive suspension of liquidation and
> the posting of a cash deposit, bond, or other security previously
> ordered under [19 U.S.C.§ 1673b(e)(2)];

> (B) in cases where the preliminary determination by the
> administering authority under [19 U.S.C. § 1673b(b)] was
> affirmative, but the preliminary determination under [19 U.S.C. §
> 1673b(e)(1)] was negative, shall modify any suspension of
> liquidation and security requirement previously ordered under [19
> U.S.C. § 1673b(d)] to apply to unliquidated entries of merchandise
> entered, or withdrawn from warehouse, for consumption on or after
> the date which is 90 days before the date on which suspension of
> liquidation was first ordered . . . .

19 U.S.C. § 1673d(c)(4)(A)–(B).

Commerce has developed certain practices in determining importer knowledge of

dumping and material injury. With respect to importer knowledge of sales at less than fair value,

Commerce "normally considers margins of 25 percent or more for [export price] sales sufficient

to impute knowledge of dumping" to the importers who purchase the merchandise at issue from

foreign exporters. Prelim. Determination, 66 Fed. Reg. at 24,106 (citing Certain Small Diameter

Carbon & Alloy Steel Seamless Standard, Line & Pressure Pipe from the Czech Rep., 65 Fed.

Reg. 33,803 (ITA May 25, 2000) (prelim. determination of critical circumstances)). In other

words, in cases where, as here, export price is calculated by reference to sales made to

unaffiliated purchasers in the United States, and Commerce determines that the antidumping duty

margin with respect to those sales is 25% or more, Commerce "imputes"[29] knowledge of

dumping to the importer.

With respect to knowledge of material injury by reason of such less than fair value sales,

Commerce normally looks to the ITC's preliminary injury determination. "If [in its preliminary

determination] the ITC finds a reasonable indication of present material injury to the relevant

U.S. industry, the Department will determine that a reasonable basis exists to impute importer

---

[29]     While Commerce states that the 25% or more rule results in the imputation of knowledge that the exporter was selling the merchandise at issue at less than its fair value, the "knew or should have known" language is often used to impose upon a person a duty of inquiry. *See, e.g.*, *Hauk v. First Nat. Bank of St. Charles*, 680 S.W.2d 771, 775 (Mo. App. E.D. 1984) ("The . . . term ["should have known"] signifies a duty upon a party to inquire whereas the [the term "had reason to know"] does not impose such a duty."); *Chernick v. United States*, 372 F.2d 492, 496 (Ct. Cl. 1967) ("The test of what an official in charge of accepting bids 'should' have known must be that of reasonableness, i.e., whether under the facts and circumstances of the case there were any factors which reasonably should have raised the presumption of error in the mind of the contracting officer . . . .").

knowledge that there was likely to be material injury by reason of dumped imports." Prelim.

Determination, 66 Fed. Reg. at 24,106. *See, e.g.*, Certain Automotive Replacement Glass

Windshields From the P.R.C., 66 Fed. Reg. 48,233, 48,238 (ITA Sept. 19, 2001) (prelim.

determination); Certain Cut-to-Length Carbon Steel Plate From the P.R.C., 62 Fed. Reg. 61,964,

61,967 (ITA Nov. 20, 1997) (final determination).


     In the Final Determination, Commerce determined that critical circumstances existed

with respect to Zhejiang, High Hope, Kunshan, and the PRC-wide entity. Final Determination,

66 Fed. Reg. at 50,610. After the correction of certain ministerial errors, Zhejiang, High Hope,

Kunshan, and the PRC-wide entity received antidumping duty margins in excess of 25%, i.e.,

25.88%, 45.46%, 49.60%, and 183.80%, respectively. *See* Am. Final Determination, 66 Fed.

Reg. at 63,672. With respect to critical circumstances, Commerce stated:

> [Title 19 U.S.C. § 1673d(a)(3)] provides for a determination of
> critical circumstances to be based on three elements. First, there is
> evidence of the knowledge of dumping. This is demonstrated by
> the fact that Zhejiang, Kunshan, High Hope, and the PRC-wide
> entity all have dumping margins of over 25 percent. Second, there
> is evidence of knowledge of material injury (here indicated by the
> preliminary finding of material injury by the International Trade
> Commission). Finally, there is evidence of massive imports of
> subject merchandise by Zhejiang, Kunshan, High Hope, and the
> PRC-wide entity within a relatively short period.

Decision Mem., Pub. R. Doc. 216 at 9 (citing Final Affirmative and Negative Determinations of

Critical Circumstances Mem. of 9/26/01, Conf. R. Doc. 76, Attach. 1). In the antidumping duty

order, Commerce stated:

> In accordance with [19 U.S.C. § 1673e(a)(1)], the Department will

direct Customs[30] to assess, upon further advice by the
Department, antidumping duties equal to the amount by which the
normal value of the subject merchandise exceeds the U.S. price of
the subject merchandise for all relevant entries of honey from the
PRC. These antidumping duties will be assessed on all
unliquidated entries of honey from the PRC entered, or withdrawn
from warehouse, for consumption on or after May 11, 2001, the
date on which the Department published its notice of preliminary
determination for this investigation in the Federal Register, except
for subject merchandise exported by Kunshan, High Hope,
Zhejiang, or [unnamed companies comprising the PRC-wide
entity]. For merchandise exported by Kunshan, High Hope,
Zhejiang, or by [unnamed companies comprising the PRC-wide
entity], we are directing [Customs] to assess antidumping duties on
all unliquidated entries of the subject merchandise that are entered,
or withdrawn from warehouse, for consumption on or after
February 10, 2001, the date 90 days prior to the date of publication
of the preliminary determination in the Federal Register . . . in
accordance with the critical circumstances finding in the final
determination.

Am. Final Determination, 66 Fed. Reg. at 63,672 (citation omitted).[31]

Plaintiffs challenge Commerce's practice of imputing knowledge of dumping to

importers "based entirely on the fact that the final dumping margin for certain respondents was

25% or greater." Pls.' Mem. at 17. Plaintiffs assert that Commerce's practice is "arbitrary and

unreasonable" in the NME context where that importer had "(1) no knowledge of the surrogate

---

[30]      Effective March 1, 2003, the United States Customs Service was renamed the
Bureau of Customs and Border Protection of the United States Department of Homeland
Security. *See* Reorganization Plan Modification for the Dep't of Homeland Security, H.R. DOC.
108-32, at 4 (2003).

[31]      The liquidation of any unliquidated entries of honey from the PRC, which were
entered on or after February 10, 2001, and May 11, 2001, has been enjoined pursuant to the
court's order of March 10, 2003, pending final court decision, pursuant to 19 U.S.C. § 1516a(e).
*See* Court Order (Mar. 10, 2003).

values Commerce intend[ed] to use for its margin calculation and (2) no control over which

surrogate values [would] ultimately be used." *Id*. at 21–22 (citation omitted). In support of their

position Plaintiffs cite *ICC Industries, Inc. v. United States*, 10 CIT 181, 632 F. Supp. 36 (1986),

*aff'd* 812 F.2d 694 (Fed. Cir. 1987).[32] The trial court in *ICC Industries, Inc.* upheld Commerce's

---

[32]        The court in *ICC Industries, Inc. v. United States*, 10 CIT 181, 632 F. Supp. 36, *aff'd* 812 F.2d 694 (Fed. Cir. 1987) applied the pre-URAA version of 19 U.S.C. § 1673d(a)(3). At that time, 19 U.S.C. § 1673d(a)(3)(A)(ii) did not require, as it does now, a finding that the importer knew or should have known "that . . . there would be material injury by reason of . . . sales [at less than fair value]." *Compare* 19 U.S.C. § 1673d(a)(3)(A)(ii) (2000) *with* 19 U.S.C. § 1673d(a)(3)(A)(ii) (1982); *see* H.R. REP. NO. 103-826(I), at 50 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3822. *See also Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs.*, 23 CIT at 112 n.39, 44 F. Supp. 2d at 252 n.39 (citing 19 U.S.C. § 1673d(a)(3) (1988)) ("Under the pre-URAA practice, critical circumstances existed if Commerce found massive imports of the subject merchandise over a relatively short period of time prior to the suspension of liquidation and (1) there is either a history of dumping or (2) the importer knew or should have known that the exporter was selling the merchandise at less than fair value. . . . Commerce did not require the 'likelihood of material injury' prong.").

Moreover, at the time Commerce made its final affirmative critical circumstances determination in Potassium Permanganate From the P.R.C., 48 Fed. Reg. 57,347 (ITA Dec. 29, 1983), the decision reviewed in *ICC Industries*, *Inc.*, the 25% or more rule did not exist. The 25% or more rule first appears in Commerce precedent in 1984—the year after Potassium Permanganate From the P.R.C. was decided. *See, e.g.*, Pads for Woodwind Instrument Keys From Italy, 49 Fed. Reg. 28,295, 28,297 (ITA July 11, 1984) (final determination) (weighted-average margin of 1.16% not sufficiently large to raise presumption of knowledge of dumping); Carbon Steel Wire Rod From Spain, 49 Fed. Reg. 38,173, 38,175–76 (ITA Sept. 27, 1984) (final determination) (importer knew or should have known of dumped imports where margins calculated on the basis of questionnaire responses sufficiently large; weighted-average margin of 34.05% found to be sufficient); Carbon Steel Wire Rod From Arg., 49 Fed. Reg. 38,170, 38,173 (ITA Sept. 27, 1984) (final determination) (weighted-average margin of 119.11 sufficient to impute knowledge); Circular Welded Carbon Steel Pipes & Tubes From Thailand, 51 Fed. Reg. 3384, 3385 (ITA Jan. 27, 1986) (final determination) ("We normally consider margins of 25 percent or more to constitute constructive knowledge of dumping."); Welded Carbon Steel API Line Pipe From Taiwan, 51 Fed. Reg. 8865, 8866 (final determination) (ITA Mar. 14, 1986) (noting 25% or more rule); Certain In-Shell Pistachios From Iran, 51 Fed. Reg. 18,919, 18,921 (ITA May 23, 1986) (final determination) (margins of 25% or more constitute constructive knowledge of dumping). Commerce applied this rule in a case involving merchandise from the PRC as long ago as 1991. *See* Heavy Forged Hand Tools, Finished or Unfinished, With or

(continued...)

practice of imputing knowledge to importers in the PRC context where the importers "should have known the price [which was 22% below the price of comparable merchandise from a market economy country] was 'too good to be true.'" Pls.' Mem. at 19 (quoting *ICC Indus., Inc.*, 10 CIT at 185). Plaintiffs distinguish the instant case from *ICC Industries, Inc.* asserting that it is unreasonable for Commerce to impute knowledge of dumping in circumstances where, as here, the Suspension Agreement was in effect, and, as Plaintiffs argue, "the only *knowledge* importers had at the time of importation was that they were purchasing Chinese honey at prices that had been *officially sanctioned* by the Department of Commerce." *Id*. at 22 (emphasis in original). Thus, Plaintiffs contend that Commerce's finding that importers knew or should have known of sales at less than fair value is unsupported by substantial evidence and otherwise not in accordance with law.

Plaintiffs further contend that Commerce's determination that importers knew or should have known that there would be material injury by reason of subject imports is unsupported by substantial evidence and otherwise contrary to law. Plaintiffs argue that "given the restrictions and purpose of the Honey Suspension Agreement . . . it is wholly unreasonable to conclude that importers could have known imports of PRC honey were capable of causing 'material injury' as defined by the statute." Pls.' Mem. at 24 n.2. Specifically, Plaintiffs assert that "importers had no reason to believe or suspect that the [ITC] could determine that any increases in the volume of

_____

[32](...continued)
Without Handles, From the P.R.C., 56 Fed. Reg. 241, 243 (ITA Jan. 3, 1991) (final determination) (citing Tapered Roller Bearings & Parts Thereof, Finished or Unfinished, From Italy, 52 Fed. Reg. 24,198 (June 29, 1987) (final determination)).

honey imports subject to this quota restriction were 'significant.'" *Id*. at 24–25 (quoting 19

U.S.C. § 1677(7)(C)(i)).  Likewise, due to price restrictions contained in the Suspension

Agreement, Plaintiffs argue that importers had no reason to suspect that the ITC could find price

underselling, suppression, or depression.  *Id*. at 25.

The Government asserts that Commerce properly determined that critical circumstances

existed and that the Suspension Agreement was not relevant to that determination.  The

Government acknowledges that the statute does not explicitly provide for the method by which

Commerce is to evaluate the level of an importer's knowledge of dumping or material injury, and

urges that the practices it has developed are reasonable and should be accorded deference under

*Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  Def.'s Resp. at

34 (citing *Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs.*, 23 CIT at 113 n.40,

44 F. Supp. 2d at 252 n.40).  Citing Commerce's "substantial discretion," in determining

importers' knowledge of dumping, the Government argues that "[a]ll that is required is that 'the

evidence in the administrative record could have reasonably led to [Commerce's] conclusion that

the importers . . . knew or should have known that the imports were being sold at less than fair

value during the period that the dumping investigation was proceeding.'"  *Id*. at 30 (quoting *ICC*

*Indus., Inc.*, 812 F.2d at 698 (ellipsis as in original)).  With respect to knowledge of material

injury, the Government points out that "the ITC . . . determined that imports of Chinese honey

were a present cause of material injury . . . pursuant to the material injury factors specified in [19

U.S.C. § 1677(7)(B)]," and notes that Plaintiffs do not challenge the validity of that finding.  *Id*.

at 37 (citing 65 Fed. Reg. 69,573; Pls.' Mem. at 24 n.2).  The Government asserts that it was

reasonable to impute knowledge of material injury to the importers. *Id*. at 36.

Neither the statute nor the SAA instructs Commerce how to determine whether an importer knew or should have known of dumping or material injury. In the absence of such guidance on this issue, Commerce has interpreted this standard in the course of its antidumping determinations. *See, e.g.*, determinations cited *infra* nn.35, 36. Where a statute is silent or ambiguous with respect to the issue in question, the court must first determine whether Commerce's interpretation is a permissible, or reasonable, one. *See Chevron*, 467 U.S. at 843; *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001). The court finds Commerce's construction of 19 U.S.C. § 1673d(a)(3)(A)(ii), with respect to whether an importer knew or should have known of dumping and material injury, to be reasonable.

With respect to knowledge of dumping, Commerce has interpreted 19 U.S.C. § 1673d(a)(3)(A)(ii) to mean that where an antidumping duty margin is found to be 25% or more the importer knew or should have known that the exporter was selling the subject merchandise at less than fair value. Commerce's rationale is that a margin of that magnitude is sufficiently high that a reasonable importer knew, or should have discovered (upon reasonable inquiry), that it was purchasing the subject imports at less than fair value. *See* Carbon Steel Wire Rod From Arg., 49 Fed. Reg. at 38,171 ("It is the Department's position that this test is met where margins calculated on the basis of responses to the Department's questionnaire are sufficiently large that the importer knew or should have known that prices for sales to the United States (as adjusted according to the antidumping law) were significantly below home market sales prices.").

The court finds this interpretation to be a reasonable construction of the knowledge of dumping prong of 19 U.S.C. § 1673d(a)(3)(A)(ii) in the NME context. First, this court and our reviewing court have recognized that importers of merchandise from NME countries are not outside the ambit of the critical circumstances provision simply because importers cannot know, with certainty, what surrogate data Commerce might use to calculate normal value.[33] *ICC Indus., Inc.*, 10 CIT at 185; *ICC Indus., Inc.*, 812 F.2d at 698 ("While the uncertainty of not knowing which country will be chosen by the ITA as the surrogate country is seemingly unfair to an importer of goods from NME countries, this is but one criticism of the statute and is not enough to exempt the importers from the reach of the statute."). Second, although the 25% or more rule was not reviewed in *ICC Industries, Inc.*, the Court of Appeals for the Federal Circuit did consider, and uphold, Commerce's reasoning in determining that the importer knew or should have known that the sales of the merchandise in issue were made at less than fair value. Commerce had found that the importers knew that the prices at which they had purchased potassium permanganate from the PRC were "competitive," and that "the unit price of potassium permanganate was 22% less than that imported from Spain and 40% less than the price of the domestic product." *See ICC Indus., Inc.*, 812 F.2d at 698. The Court of Appeals for the Federal Circuit stated that "[t]his level of underselling . . . is sufficient to support the ITA's conclusion that these importers should have known that they were importing potassium permanganate at

---

[33]     The court notes that Plaintiffs' argument that Commerce's application of the 25% or more rule is unreasonable in the NME context where an importer (1) had no knowledge of the surrogate values Commerce would use for its margin calculation, and (2) had no control over which surrogate values would ultimately be used, Pls.' Mem. at 22, does not take into account that surrogate values are just that—surrogates for the producers' actual costs of production. The importers had a business relationship with the honey exporters and were thus in a position to make the proper inquiries concerning their suppliers' costs of production.

[less than fair value]." *Id*. at 699. The 25% or more rule adheres to, and is a reasonable extension of, that rationale. The magnitude of the margin, i.e., 25%, is sufficiently large so as to justify concluding that any person in the business of importing honey knew or should have known that the price paid for the product was disproportionately low. This being the case, the court finds Commerce's interpretation of the knew or should have known standard with respect to importer knowledge of dumping to be reasonable.[34]

With respect to importer knowledge that there would be material injury by reason of such less than fair value sales, Commerce has developed a practice of finding the requisite knowledge where the ITC has made an affirmative preliminary injury determination. *See, e.g.*, Commerce determinations cited *infra* n.36. In 1994, Congress amended the critical circumstances statute to require that Commerce find not only that an importer knew or should have known of less than fair value sales of the merchandise at issue, but also that such importer knew or should have known "that there would be material injury by reason of such [less than fair value] sales." 19 U.S.C. § 1673d(a)(3)(A)(ii). *See* H.R. REP. NO. 103-826(I), at 50, *reprinted in* 1994 U.S.C.C.A.N. at 3822. In Brake Drums and Brake Rotors From China, 62 Fed. Reg. 9160 (ITA Feb. 28, 1997) (final determination), Commerce explained the manner in which it would arrive at its knowledge of material injury determination in the following way:

---

[34]     The existence of the Suspension Agreement does not compel a different finding. As discussed *supra*, the Suspension Agreement was not an agreement to eliminate dumping, but rather an agreement to restrict the volume of imports. As such, Plaintiffs' argument that the existence of the Suspension Agreement detracts from the reasonableness of Commerce's determination that the importers here knew or should have known of dumping is misplaced.

>Pursuant to the URAA . . . the statute now includes a provision requiring the Department to determine, when relying upon [19 U.S.C. § 1673d(a)(3)(A)(ii) in its critical circumstances analysis] . . ., whether the importer knew or should have known that there would be material injury by reason of the less than fair value sales. In this respect, the preliminary finding of the . . . ITC . . . is instructive . . . . [T]he Department has determined that a preliminary ITC finding of a reasonable indication of present material injury to the U.S. industry, when coupled with massive imports and a high rate of dumping by a given exporter . . . permits the conclusion that importers of the subject merchandise from such exporters knew or should have known that such imports would cause injury to the domestic industry.

*Id*. at 9164.

Commerce's approach is reasonable. In a preliminary injury determination, the ITC determines, "based upon the information available to it at the time of the preliminary determination, whether there is a reasonable indication that a domestic industry is materially injured . . . by reason of the allegedly unfairly traded imports." ITC Preliminary Determination at 3 (citing 19 U.S.C. § 1673b(a)(1)). In making its preliminary determination, the ITC considers the volume of subject imports, their effect on prices for the domestic like product, and their impact on the producers of the domestic like product. 19 U.S.C. § 1677(7)(B)(i); ITC Prelim. Determination at 12. In its investigation of honey from the PRC, the ITC preliminarily concluded that the volume, price effects (including price suppression and depression), and impact of imports of the Subject Merchandise were significant. *See* ITC Preliminary Determination at 15–18. The ITC's findings with respect to these factors are unchallenged. *See* Pls.' Mem. at 24 n.2.

In addition, Plaintiffs do not challenge Commerce's massive imports determination, made pursuant to 19 C.F.R. § 351.206(h). According to a comparison of monthly shipment data supplied by the PRC exporters, Commerce found that "imports of honey from High Hope and Zhejiang showed post-filing increases of at least 15 percent" between October 2000 and February 2001 (the post-filing period), as compared to May 2000 through September 2000 (the pre-filing period). *See* Prelim. Determination, 66 Fed. Reg. at 24,107. When combined with the importer's actual knowledge of massive imports, and Commerce's finding of antidumping duty margins of 25% or more, an affirmative preliminary determination by the ITC that there is a reasonable indication of material injury by reason of allegedly dumped imports of the Subject Merchandise supplies sufficient reason for Commerce to charge the importer with the duty of inquiry with respect thereto.

The existence of the Suspension Agreement does not alter the court's analysis. Although, as Plaintiffs correctly note, the Suspension Agreement's declared purpose was to "prevent[] the suppression or undercutting of price levels of the domestic product," Suspension Agreement, 66 Fed. Reg. at 42,522; Pls.' Mem. at 24, Plaintiffs incorrectly conclude that an exporter's alleged compliance with the quota restrictions and the reference price negates the reasonableness of Commerce's finding that an importer knew or should have known that material injury would result from dumped imports of the Subject Merchandise. This is especially true when one considers that Commerce determines whether a suspension agreement will prevent the suppression or undercutting of domestic prices in deciding whether or not to enter into a suspension agreement with an NME country, *see* 19 U.S.C. § 1673c(*l*), whereas the ITC is

charged with determining material injury. The two determinations involve distinct analyses conducted by different agencies; Plaintiffs' argument that the existence of the Suspension Agreement renders Commerce's finding of knowledge of material injury unreasonable lacks merit. Thus, Commerce's methodology with respect to a finding that the importer knew or should have known of material injury is a reasonable interpretation of the statute.

Having determined that Commerce's interpretation of the knew or should have known standard in 19 U.S.C. § 1673d(a)(3)(A)(ii), made in the context of an antidumping investigation, is reasonable, the court must next determine whether it is deserving of some level of deference. The Court of Appeals for the Federal Circuit has held that "Commerce's antidumping determinations are 'adjudication[s] that produce . . . rulings for which deference [under *Chevron*] is claimed.'" *Pesquera Mares*, 266 F.3d at 1382 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)). Under *Chevron*, this court defers to statutory interpretations articulated by Commerce during its antidumping proceedings. *Id*. at 1382. Such pronouncements are considered to be precedential. *Id.* at 1381–82 ("Commerce routinely considers the legal interpretations announced in its prior antidumping and countervailing duty determinations to be precedential . . . . So too does the Court of International Trade and this court.") (citations omitted). Accordingly, the court finds *Chevron* deference appropriate here.

The longstanding status of Commerce's interpretations further argues in favor of deferring to them. *See Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1575 (Fed. Cir. 1994) (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978)) ("[T]he longstanding

status of Commerce's practice provides a . . . rationale for deferring to the agency's interpretation."); *see also Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1038 (Fed. Cir. 2003) (citing *Koyo Seiko Co.*, 36 F.3d at 1570, 1575) (sustaining "as reasonable Commerce's well established practice of basing interest expenses and income on fully consolidated financial statements.").  It has long been Commerce's practice to impute knowledge of dumping, for purposes of determining whether critical circumstances exist, where Commerce finds antidumping duty margins of 25% or more.[35]  Indeed, evidence of this practice is present in Commerce determinations dating as far back as 1984.  *See, e.g.*, Commerce determinations cited *supra* n.32.  In addition, Congress' silence on the matter, despite legislative amendment of 19 U.S.C. § 1673d(a)(3)(A) in 1994—a decade after Commerce instituted its practice of imputing knowledge of dumping under the 25% or more rule—is significant.  Moreover, as discussed *supra*, for years Commerce has, in the course of antidumping investigations, imputed knowledge of material injury by reason of sales at less than fair value, where the ITC makes an affirmative preliminary determination of material injury.[36]  Thus, (1) having determined that Commerce's

---

[35]      *See, e.g.*, Commerce determinations cited *supra* n.32; Certain Cut-to-Length Carbon Steel Plate From The P.R.C., 62 Fed. Reg. 31,972, 31,978 (ITA June 11, 1997) (prelim. determination) ("In determining whether there is a reasonable basis to believe or suspect that an importer knew or should have known that the exporter was selling the plate at less than fair value, the Department normally considers margins of 15 percent or more sufficient to impute knowledge of dumping for constructed export price (CEP) sales, and margins of 25 percent or more for export price (EP) sales."); Steel Concrete Reinforcing Bars From the P.R.C. & Pol., 65 Fed. Reg. 54,228, 54,229 (ITA Sept. 7, 2000) (prelim. critical circumstances determinations) ("[T]he Department's normal practice is to consider margins of 25 percent or more sufficient to impute knowledge of dumping."); Certain Cold-Rolled Carbon Steel Flat Products From Taiwan, 67 Fed. Reg. 62,104, 62,105 (ITA Oct. 3, 2002) (final determination) (declining to impute knowledge where margins were less than 25% "threshold" to impute knowledge).

[36]      *See, e.g.*, Brake Drums & Brake Rotors From China, 62 Fed. Reg. at 9164;

(continued...)

interpretation of 19 U.S.C. § 1673d(a)(3)(A)(ii) with respect to the knew or should have known standard in both the dumping and material injury contexts is reasonable, (2) the interpretation having been made in the context of an antidumping determination, and (3) in light of the longstanding status of Commerce's interpretation, Congress having been afforded an opportunity to address this interpretation and having failed to do so, the court sustains Commerce's interpretation of the knew or should have known standard in 19 U.S.C. § 1673d(a)(3)(A)(ii).[37] *See Pesquera Mares*, 266 F.3d at 1381–82.

As noted, Plaintiffs do not challenge Commerce's massive imports determination, nor do they argue that Commerce miscalculated the antidumping duty margins Commerce found to be in excess of 25%. Further, it is undisputed that the ITC made an affirmative preliminary injury determination, the merits of which are unchallenged. Thus, in light of the court's finding with respect to Commerce's construction of 19 U.S.C. § 1673d(a)(3)(A)(ii), the court finds that Commerce's final affirmative critical circumstances determination is in accordance with law and supported by substantial evidence.

---

[36](...continued)
Certain Cut-to-Length Carbon Steel Plate From the P.R.C., 62 Fed. Reg. at 61,967; Certain Automotive Replacement Glass Windshields From the P.R.C., 66 Fed. Reg. at 48,238–39.

[37]      The court further notes that Commerce's interpretations of the knew or should have known standard are precisely the sort that Congress endowed Commerce with the authority to make in light of its expertise in administering the antidumping laws. *See Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs.*, 23 CIT at 113 n.40, 44 F. Supp. 2d at 252 n.40 (citing *Chevron*, 467 U.S. at 843) ("The URAA and SAA are silent as to how Commerce should make a finding of knowledge of material injury. Therefore, Commerce is afforded reasonable discretion in formulating a methodology.").

III.     *Commerce's valuation of raw honey is neither in accordance with law nor supported by substantial evidence*

Among the factors of production valued by Commerce was raw honey.  In valuing raw honey, Commerce "used an average of the highest and lowest price for raw honey given in [an article published in The Tribune of India ("Tribune Article")], entitled, 'Apiculture, a major foreign exchange earner.'"  Prelim. Determination, 66 Fed. Reg. at 24,106.  In the Final Determination, Commerce continued to value honey using information contained in the Tribune Article:

> The raw honey price data from *The Tribune of India* is the best available surrogate value for the following reasons: 1) it is the most contemporaneous, dated May 1, 2000; 2) the broad-based data is specific to Indian raw honey prices (i.e., generally Indian honey, like PRC raw honey, has a high moisture content); and 3) it is quality agricultural data.  We do not find that the prices offered by petitioners and respondents offer more accurate or representative alternatives.

Decision Mem., Pub. R. Doc. 216 at 21; *see The Tribune of India* (May 1, 2000), Pub. R. Doc. 219, App. IX.  In deciding to use the Tribune Article, Commerce rejected a study published by the Agriculture and Processed Food Products Export Development Authority ("APEDA Study"), finding that "the values in . . . the APEDA study submitted by respondents . . . suffer from inherent weaknesses not present in the prices reflected in *The Tribune of India*."  Decision Mem., Pub. R. Doc. 216 at 21.  In particular, Commerce stated that it was

> unpersuaded that the APEDA study . . . provides a more accurate representation of Indian raw honey prices than does *The Tribune of India*.  The APEDA study is a feasibility study which projects possible future revenues for Indian honey producers.  The prices reflected in the study, therefore, are not actual market prices, but rather price projections or estimates.  Although respondents are correct that the Department has used projections in the past, its

> preference is still to use actual prices whenever appropriate actual
> prices are available. Furthermore, the APEDA study appears to
> have been completed in 1999; thus, its price projections for 1999
> are probably based on information gathered prior to 1999.
> Therefore, the APEDA study is not contemporaneous with the POI.

*Id*. at 21–22; *see also* APEDA Study, Pub. R. Doc. 114, Ex. 1. The Tribune Article listed the sale price of honey to be 25 to 45 rupees per kilogram, and Commerce determined the value of raw honey to be 35 rupees per kilogram. *See* Prelim. Analysis Mem., Conf. R. Docs. 47–49 at 2.

Plaintiffs take issue with Commerce's rejection of the APEDA Study entitled "A study on the Export potential for Indian Honey," which listed the average "value" of honey in India to be 25 rupees per kilogram. Pls.' Mem. at 26; APEDA Study, Pub. R. Doc. 114, Ex. 1, ¶ 3.1. Plaintiffs argue that the Tribune Article is not the best available information and that the reasons Commerce offered for rejecting the APEDA Study are speculative, for the following reasons: (1) Commerce assumed that the study contains *estimates* of prices instead of actual prices, *id*. at 28; and (2) Commerce stated that the information represented in the APEDA Study is "'probably based on information gathered prior to 1999.'" *Id*. (quoting Decision Mem., Pub. R. Doc. 216 at 22). Plaintiffs assert that the APEDA data are superior to the data contained in the Tribune Article because the APEDA Study "demonstrates detailed and extensive research into the Indian honey industry," *id*. at 29, as opposed to the "offhand reference" as to the price of honey varying "from Rs 25 to Rs 45 per kg" contained in Tribune Article. *Id*. Plaintiffs further point out that the Tribune Article does not specify when the pricing data were compiled. *Id*. at 30.

It is well-established that Commerce enjoys wide discretion in valuing the factors of

production. *See Nation Ford Chem. Co.*, 166 F.3d at 1377 (citing *Lasko Metal Prods. Inc.*, 43 F.3d at 1446) ("While § 1677b(c) provides guidelines to assist Commerce in [constructing foreign market value], this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines."). However, "[d]espite the broad latitude afforded Commerce and its substantial discretion in choosing the information it relies upon, the agency must act in a manner consistent with the underlying objective of 19 U.S.C. § 1677b(c)—to obtain the most accurate dumping margins possible." *Shandong Huarong Gen. Corp. v. United States*, 25 CIT __, __, 159 F. Supp. 2d 714, 719 (2001) (citing *Writing Instrument Mfrs. Ass'n v. United States*, 21 CIT 1185, 1192, 984 F. Supp. 629, 637 (1997)); *Shakeproof Assembly Components*, 268 F.3d at 1382 ("[T]he critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible."). To determine whether Commerce's selection of surrogate values furthers this statutory purpose, the court must determine whether "Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents." *Shandong Huarong*, 159 F. Supp. 2d at 719 (citations omitted).

As between the source of data relating to the price of honey Commerce selected, and that offered by Plaintiffs, Commerce appears to have used the more reliable source. The Tribune Article addresses the sale price of honey, whereas the table in the APEDA Study from which Plaintiffs identify the "average value of honey" appears in the context of a discussion concerning the development of a model for "doubl[ing] the number of bee colonies every 2 years," not

determining the value of honey. *See The Tribune of India* (May 1, 2000), Pub. R. Doc. 219, App. IX, at 43 (stating that "[t]he sale price of honey by beekeepers in India varies from Rs 25 to Rs 45 per kg" and comparing that price range to prices charged in the United States and other countries); APEDA Study, Pub. R. Doc. 114, Ex. 1, tbl. 3.1; *id.* ¶ 3.1.1. The publication of the Tribune Article, dated May 1, 2000, coincides with the POI.[38] The APEDA Study, in contrast, bears the year 1999. *See generally* APEDA Study, Pub. R. Doc. 114, Ex. 1. Notwithstanding Plaintiffs' assertion that "there is no reason to assume that 'present-day' values contained in the study are from any period earlier than 1999," Pls.' Mem. at 28, the APEDA Study does not specifically mention any date later than 1998 for the material referenced therein. Thus, as Commerce noted in the Decision Memorandum, the information in the APEDA Study was not contemporaneous with Commerce's investigation. Moreover, the Tribune Article, published on *The India Tribune*'s Web site, was publicly available, while Plaintiffs make no such argument with respect to the APEDA Study. *See* 19 C.F.R. § 351.408(c)(1) ("The Secretary normally will use publicly available information to value factors.").

Nonetheless, the results reached by applying the data from the Tribune Article are sufficiently incredible so as to call into question their reliability. Specifically, the weighted-average U.S. price of honey from the PRC was calculated as $857.77 for Zhejiang, $866.59 for Kunshan, and $805.32 for Inner Mongolia (per metric ton). *See* Final

---

[38] The record contains two identical versions of the Tribune Article which bear different dates – January 1, 2000 and May 1, 2000. In the Decision Memorandum, Commerce indicated that it considered the article bearing the date May 1, 2000. The court notes that both of these dates fall within the POI.

Analysis Mem., Conf. R. Doc. 74, App. XIX (Zhejiang); Conf. R. Doc. 73, App. IX (Kunshan);

Conf. R. Doc. 75, App. IX (Inner Mongolia).  In accordance with the Suspension Agreement,[39]

the minimum price at which honey could be sold during the POI was equal to 92% of the

weighted-average of the honey unit import values from all other countries.[40]  *See* Suspension

Agreement, 60 Fed. Reg. at 42,524.  Thus, taking Zhejiang's data as an example, the weighted-

average of honey unit import values from all other countries during the POI would have been

approximately $932.25 per metric ton.  Using a price of 35 rupees per kilogram, however,

Commerce calculated normal value for Zhejiang to be $1,001.99 per metric ton and the

foreign unit price in U.S. dollars to be $1,067.72.  *See* Final Analysis Mem., Conf. R. Doc.

74, App. VIII.  Thus, the weighted-average of the honey unit import values from all other

---

[39]     As previously noted, Plaintiffs may not rely on compliance with the Suspension Agreement either (1) as evidence that their U.S. sales were not made at less than fair value or (2) as proof that they neither knew or should have known that the Subject Merchandise was being dumped, or that sales of the Subject Merchandise would result in material injury.  Nonetheless, Plaintiffs' alleged compliance with the Suspension Agreement (which Commerce does not dispute) is a useful way to establish the facts upon which a substantial evidence determination can be made.  In other words, while Plaintiffs' reliance on the Suspension Agreement as evidence to refute a dumping or critical circumstances determination may not be justified, the actual facts relating to U.S. sales price resulting from compliance with the Suspension Agreement can be used to determine if a finding is supported by substantial evidence.

[40]     It is clear that the Suspension Agreement was before Commerce during the course of the Second Investigation and thus may fairly be considered part of the record.  *See Floral Trade Council v. United States*, 13 CIT 242, 244, 709 F. Supp. 229, 231 (1989) (holding documents from earlier investigations that become "sufficiently connected to the current investigation [may] be considered to be before the agency for purposes of the decision at issue.").  At the administrative level, Commerce addressed Plaintiffs' arguments concerning the relevance of the Suspension Agreement with respect to such matters as, e.g., Commerce's critical circumstances determination.  *See, e.g.*, Decision Mem., Pub. R. Doc. 216 at 4 (cooperation of PRC producers/exporters), 7 (critical circumstances); Final Determination, 66 Fed. Reg. at 50,610 (adopting by reference the Decision Memorandum).  Likewise, the issue was argued before this court in the parties' briefs, *see, e.g.*, Pls.' Mem. at 4; Def.'s Mem. at 20, and at oral argument.

countries was approximately $69.74 less than Commerce's calculation of the normal value of honey sold by Zhejiang. Because raw honey is by far the most important factor of production, its valuation appears to be the most anomalous. As MOFTEC put it in a letter to Commerce, "This conclusion implies that the whole world was dumping honey during [the POI], which is irrational." Letter of MOFTEC to Commerce via facsimile of 9/21/01, Pub. R. Doc. 237 ¶ 2. While it is possible that the PRC is the worldwide high cost producer of honey, the very magnitude of the difference between Commerce's calculation of normal value and the weighted-average of honey unit import values from all other countries during the POI, calls into question Commerce's methodology and the evidence on which it relied. Indeed, this anomalous result indicates that Commerce's methodology was lacking, and thus not in accordance with law, and that its conclusion was not supported by substantial evidence.

On remand, Commerce shall revisit its decision to value raw honey at 35 rupees per kilogram. Commerce shall (1) determine whether the use of the Tribune Article results in the "valuation of [raw honey] . . . based on the best available information regarding the value[] of such factor[]," 19 U.S.C. § 1677b(c)(1), (2) should it find that it is, explain in detail how the use of 35 rupees per kilogram in determining normal value "evidences a rational and reasonable relationship to the factor of production it represents," *Shandong Huarong*, 159 F. Supp. 2d at 719, (3) no matter whether it continues to use the Tribune Article or other sources, fully and completely justify any sources of data as the "best available information" for the finding such data are used to support, and (4) should any resulting calculation of normal value of honey from the PRC exceed that of the weighted-average of the honey unit import values from all other

countries during the POI, explain in detail how this furthers the goal of estimating antidumping

duty margins as accurately as possible. *See Lasko Metal Prods. Inc.*, 43 F.3d at 1446. To the

extent Commerce's findings on remand alter its determinations with respect to the calculation of

antidumping duty margins or critical circumstances, Commerce shall amend such determinations

accordingly.


CONCLUSION

Based on the foregoing, this matter is remanded to Commerce for further consideration in

conformity with this opinion. Such remand determination is due within ninety days of the date of

this opinion, comments are due thirty days thereafter, and replies to such comments eleven days

from their filing.


_____/S/ Richard K. Eaton_____

Decided:        November 21, 2003
                New York, New York